251 N.J. Super. 402 (1991)
598 A.2d 530
ROBERT VAGNONI AND FAY VAGNONI, HIS WIFE, ET AL., PLAINTIFFS,
v.
THOMAS J. GIBBONS AND PHILOMENA K. GIBBONS, HIS WIFE AND RICHARD MUSTARD, ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division Atlantic County.
July 19, 1991.
*403 Joseph P. Murray, for plaintiffs.
Daniel J. Saul, for defendants (Horn, Kaplan, Goldberg, Gorney & Daniels, attorneys).
William E. Gasbarro, for City of Brigantine.
GIBSON, J.S.C.
This is an adverse possession claim in which the competing claimants are neighbors. At stake is a portion of the waterway adjacent to their homes located on the bay in Brigantine, New Jersey. The case was tried without a jury and the following represents the court's findings of fact and conclusions of law.

Findings of Fact.
Plaintiffs, Robert and Fay Vagnoni and Albert and Shirley Rahmer, are the owners of Lot 19 in Block 252, also known as 3717 Brigantine Boulevard, Brigantine, New Jersey. Defendants include Thomas J. Gibbons and various unit owners in the Bonita Bay condominiums located next door at 3709 Brigantine Boulevard, also known as Lots 20 and 21 in Block 252. The City of Brigantine has also been named as a defendant. Both properties are adjacent to the inland waterway known as Bonita Bay and both have docking facilities which extend from the bulkhead line out into the waterway.
For a number of years, plaintiffs and their predecessors in title have utilized certain pilings on defendants' side of the *404 property line (Lot 20) and have moored boats between those pilings and their dock. Sometime in 1989, representatives of the Bonita Bay Condominium Association requested that plaintiffs cease using the slips. Plaintiffs refused and subsequently instituted this suit seeking a declaratory judgment that they had acquired title to the disputed area by adverse possession. Defendants counterclaimed seeking a declaration that their title was superior and also sought damages for the loss of the use of the slips.
The first factual question which needs to be addressed relates to the underlying title to the waterway. Plaintiffs claim that although the original developer acquired both the upland and the riparian rights and conveyed both to the early purchasers, a break in the title chain occurred in the mid-1950's. At that point, the upland and the riparian rights to Lots 20 and 21 were owned by Heritage Home, Inc. (Heritage). When the lots were sold in 1956, plaintiffs claim that Heritage retained the riparian rights, including the area where plaintiffs now have the three boat slips. However, defendants claim that the riparian rights had previously been sold to the City of Brigantine in 1938 and were held by the city for many years until they were conveyed to defendants in 1990. The more persuasive evidence fails to support either position.
Early deeds demonstrate that the area in which these properties are located was first developed in the 1920's by a developer known as the Island Development Company (Island). When Island acquired the land it also acquired riparian rights. Defendants' property, Lots 20 and 21, was first conveyed by Island to Margate Finance Company in 1928. At that time, the lots were described simply as Lots 20 and 21 "as shown on map 1-B of Island Development Company." An examination of map 1-B, particularly when considered along with the expert testimony submitted during the trial, persuasively demonstrates that the conveyance included not just the upland, but the waterway portion of the lots west of the bulkhead line.
*405 Until 1956, every deed in the title chain carried that same designation. In 1955, Lots 20 and 21 were owned by the Clousers and yet to be developed. The Clousers hired Heritage to construct a residence on the site. During the construction and as security for that transaction, the Clousers conveyed the property to Heritage. Once the home was completed and paid for, Heritage reconveyed the property to the Clousers. For the first time in the title chain, however, Heritage included a metes and bounds description in the deed. Inexplicably, the description reflected dimensions of only 80' by 127' with the outer depth being the high water line of Bonita Tideway. Although the deed also mentioned that the lots were "as shown in Map 1-B of Island Development Company," no explicit reference was made to the waterway.
Plaintiffs' expert opined that the conclusion to be drawn from that description is that Heritage intended to retain the waterway. I disagree. Admittedly, the metes and bounds description and the map reference are inconsistent and thereby create an ambiguity. The deed does not resolve that ambiguity but the surrounding circumstances do and they support the conclusion that the parties did not intend Heritage to retain the waterway.
Heritage was a building company. It had no ability to use the riparian rights unless it also retained the upland. No access to the docks existed except by water. Nor could Heritage have gained access through one of the neighboring properties; they were owned by third parties. Plaintiffs' counsel argues that because there was a ramp not too far from these properties, access could have been achieved by boat. I find that argument unpersuasive. As a fact finder, I am simply unwilling to attribute such an unlikely intent to a builder.
Even if I were to disregard the above circumstances and the testimony of Ned Carrier regarding them, I would still find it highly unlikely that an owner of bayfront lots would convey them without including the waterway rights. Such a step, *406 although possible, would be extraordinary. Given the ambiguity in the deed, my reaction as a fact finder is to select the interpretation which I believe to be the most consistent with common sense. In this case, common sense supports the conclusion that Heritage did not intend to retain the riparian rights and/or the waterway. Thus, although the metes and bounds description fails to reference it, when the deed is read as a whole and in light of the surrounding circumstances, it can and should be read to include the waterway.
The title chain out of the Clousers and through the present condominium owners is not in dispute. Thus, whatever the Clousers acquired in 1956 ultimately passed to Gibbons and the other defendants. Because of the doubts which arose regarding their title following their dispute with plaintiffs, however, defendants convinced the City of Brigantine to convey title to the disputed area to them. Whether the city had any title to convey, however, depends on how one views the conveyance to the city back on November 30, 1938. That deed was from Brigantine Beach Company and conveyed a large tract of property along Brigantine Boulevard. It also contained a number of exceptions, including Lot 19 in Block 252-B, the property now owned by plaintiffs. Although it did not except out Lots 20 and 21 (Defendants' property), Brigantine Beach Company did not own those lots in 1938. They had already been conveyed out by the successors of Island Development Company to Howard G. Harris, the predecessor in interest to the Clousers. Stated differently, I am not satisfied that Brigantine Beach Company still owned the waterway in front of Lots 20 and 21 in 1938. The waterway portion of Lots 20 and 21 and the riparian rights were conveyed by the original developer and eventually acquired by defendants through a chain of title which did not include the City.
The next factual finding relates to the joint ownership of these properties from 1967 to 1980. As the legal conclusion which follows will make clear, the significance of that joint ownership is that it undermines the adverse quality of plaintiffs' *407 occupancy during a substantial part of the time required to establish their claim.
On September 16, 1967, John Matteoli and his parents acquired title to Lot 19 in Block 252 (3717 Brigantine Boulevard). Five years earlier, on September 24, 1962, John's parents acquired title to Lots 20 and 21. Thus, as of 1967, John Matteoli Jr. was a co-tenant with his parents to Lot 19 and co-occupied the waterway portion of Lots 19, 20 and 21. Lot 19, of course, is the lot now owned by plaintiffs and the base from which they claim adverse possession of the neighboring waterway. However, Matteoli testified that his utilization of the slips, including those in the disputed area of Lot 20, was with the permission of his parents. The joint use was therefore permissive not adverse.
In addition to the above defects, there is a more fundamental question of whether the other elements of this cause of action were proven with the requisite clarity. For example, it is significant that the area in dispute is a waterway. One may question how effective the notice of an adverse claim would be to third parties in such a setting. Given the nature of the use as well as the ownership of these properties over the years, it seems highly unlikely that anyone would have been alerted to an adverse claim here until the confrontation between the present parties. That probability is underscored by the weakness of the proof regarding possession.
For example, it is not clear from the evidence when the docks and pilings in front of Lots 19, 20 and 21 where actually installed. Heritage built a residence for the Clousers on Lots 20 and 21 back in the late 1950's. It is logical to assume that there were no docks at the site prior to that but that is not clear. Although there are photographs in evidence, the only clear record of the early dock configuration is shown on the riparian map dated 1977. That map appears to depict a different piling arrangement than presently exists. It is thus unclear *408 as to whether the current piling configuration has been in place for over 20 years.
John Matteoli, Jr. testified regarding the dock operations but his testimony did more to highlight the gaps than to resolve them. As indicated earlier, from 1968 through 1980, Lot 19 was jointly owned. The Matteolis operated all three sections of the waterway as an integrated unit. Under such circumstances, John Matteoli's parents would not have been on notice of an adverse claim. The dock operation was conducted with their permission and for their joint benefit. It was not until they sold their property that the use of the slips became adverse. On October 11, 1980, the Matteolis sold Lots 20 and 21 to Beach Cove Club. In January of the same year, they sold Lot 19 to the Marenellas, Marshalls, and Vagnonis. According to Matteoli, the principals of Beach Cove were not particularly interested in the waterway at that time. Thus it is unlikely that they would have been aware of any encroachment. However, even if the court assumes that the Vagnonis' possession (the use of the slips) was sufficiently clear and open, their possession only covers the period that extends from 1980 to 1990, the latter date being when this law suit started.
The final factual item which must be addressed is the issue of damages. Plaintiffs and their predecessors rented slips to members of the public for many years. Their value for a summer season was estimated at $650 each. Although there is no evidence that defendants actively sought to rent slips, or what market existed for slips within the condominium complex, the $650 number was stipulated. Thus, if defendants are entitled to recover on their counterclaim, it would arguably be in the amount $1950.00 for the one or two years after the demand, subject to any off-set for expenses. No testimony was preferred with respect to that.

Legal Conclusions.
Plaintiffs' claim that they acquired title to the disputed section of the waterway in front of Lot 20 by adverse possession. *409 The elements of proof necessary to establish such a claim are well established.
It is familiar law that one who claims title by adverse possession has the burden of proving, by clear and convincing evidence, possession which is actual and exclusive, open and notorious, continued and uninterrupted, and adverse and hostile for the statutory period. [Meyers v. Pavalkis, 73 N.J. Super. 208, 214, 179 A.2d 534 (App.Div. 1962)]
The requirement that the possession be hostile, that is, that the occupant actually intend the occupancy to be adverse, was eliminated in Mannillo v. Gorski, 54 N.J. 378, 386, 255 A.2d 258 (1969). Even with that requirement eliminated, however, plaintiffs' proofs are insufficient.
For one thing, the evidence regarding possession is less than clear. As noted in the factual findings, the occupancy of the disputed area began in 1967 when John and Louise Matteoli along with their son John acquired Lot 19. Within a year or so, John Jr. began to improve the docks and thereafter operated them for himself and his parents. The problem with the Matteoli occupancy is that it was not adverse. John Jr. was acting for himself and his parents. Since his parents had an interest in both Lot 19 as well as Lots 20 and 21, the occupancy of the disputed waterway was neither adverse nor exclusive. Heck v. Cannon, 24 N.J. Super. 534, 95 A.2d 23 (Ch.Div. 1953); Cunningham, Stoebuck & Whitman, The Law of Property: (Adverse Possession), § 11.7, at 762-763 (1984).
It has long been held that possession of property by one co-tenant is not considered to be adverse to another co-tenant. Such possession is presumed to be in accordance with the occupants' right as a part owner and possessor of the whole undivided land. Monesson v. Alsofrom, 82 N.J. Super. 587, 590, 198 A.2d 783 (App. 1964); Heck v. Cannon, supra. In the instant case, it is more than a presumption. Plaintiffs' own witness indicated that he was operating the docks with his parents' permission and for their benefit and his own. His parents had no reason to suspect that his occupancy of their waterway could deprive them of their title.
*410 Defendants' divergence of interests did not occur between the owners of Lot 19 and Lots 20 and 21 until the Matteolis sold the properties in 1980. Even then, the proofs regarding adverse occupancy were weak. It was not until 1989 that the proof of adverse possession becomes clear. Even if the court assumes that the proof was clear beginning in 1980, it would still fail because the possession did not continue for the requisite period of time. Stated differently, regardless of the statutory basis, plaintiffs and their predecessors did not adversely occupy the disputed area for the requisite period of time. See N.J.S.A. 2A:14-7 and -30.
Plaintiffs argue that they can tack their possession on to that of their predecessors in title. Based on their claim that their predecessor, John Matteoli Jr., occupied the same area adversely, they claim that their possession has continued at least since 1967. See Heck v. Cannon, supra, 24 N.J. Super. at 540, 95 A.2d 23. The problem with that claim is that Matteoli's occupancy was not adverse. Although plaintiffs argue that the joint occupancy was not fatal because John Jr.'s parents never acquired title to the waterway, this court has found otherwise. The factual findings demonstrate that the transfer from Heritage to the Clousers was intended to include the rights to the waterway. See also N.J.S.A. 46:3-16.
Even if the court had agreed with plaintiffs' factual assertion in that regard, the adverse possession claim would fail. In other words, even if this court were to assume that the Clousers and Heritage intended that the Clousers reacquire only the upland, plaintiffs would still have to prove all of the elements of adverse possession with the requisite clarity. I am not satisfied that they have met that burden. The proofs with respect to the possession of the waterway were too vague. They would not satisfy even the "preponderance" standard of proof. Cf. Meyers v. Pavalkis, supra, 73 N.J. Super. at 214, 179 A.2d 534.
*411 If one assumes that the Matteolis did not acquire the riparian rights to Lots 20 and 21, the proof problems are somewhat different. Occupancy has to be adverse to the title holder. The Law of Property, supra at 757. The problem here is that if one accepts plaintiffs' position, Heritage would be the title holder and Heritage is not a party to this action. It is not appropriate that this court determine the rights of plaintiffs vis-a-vis a non-party. Another problem created by the notion that Heritage owned the waterway adjacent to Lots 20 and 21 is that it produces the anomalous circumstance of having one non-title owner (the Vagnonis) seeking to adversely occupy property to the exclusion of another non-title holder (the Gibbons). Plaintiffs offer no authority for the proposition that two non-title holders can obtain adverse possession against each other. The principles which apply in this area appear to suggest otherwise. See generally 13 N.J.Practice (Celentano, Real Estate Law and Practice) (1991), § 8.12 at 196; Mannillo v. Gorski, supra; Braue v. Fleck, 23 N.J. 1, 127 A.2d 1 (1956).
In sum, and for a variety of reasons both factual and legal, this court concludes that plaintiffs have failed to prove their cause of action for adverse possession. Nor are plaintiffs entitled to any relief against the city. It is not necessary that the court address the various claims against Brigantine since the city's conveyance to defendants has been disregarded. Conversely, the Gibbons and the other unit owners on Lots 20 and 21 have satisfactorily demonstrated their ownership of the waterway adjacent to their property, including the area which is the subject of this dispute. Left to be resolved is their counterclaim for damages.
Although the parties stipulated the value of the slips, the proofs regarding this claim were uncertain. Value is only one of the elements of a damage claim. For example, there was no indication as to how defendants could successfully rent these slips. Certainly some work would be necessary in order to achieve proper access. No proof was submitted as to that. *412 Nor was there any proof as to whether a market exists for slips which are part of this condominium complex. Thus, although it is clear that the slips have value to defendants, quantifying that value under the circumstances here would be speculative. Defendants counterclaim for damages will therefore be denied. Counsel for Gibbons should submit an order consistent with this ruling.